# United States Tax Court

T.C. Memo. 2024-45

ROBERT Y. DIAZ AND BRITTANY L. DIAZ,
Petitioners

v.

COMMISSIONER OF INTERNAL REVENUE,
Respondent

————

Docket No. 4855-20.                              Filed April 16, 2024.

————

Robert Y. Diaz and Brittany L. Diaz, pro sese.

*Anne M. Craig* and *Melinda K. Fisher*, for respondent.

## MEMORANDUM FINDINGS OF FACT AND OPINION

LAUBER, *Judge*:  This case, like several others pending in this Court, involves the Federal income tax liability of a U.S. taxpayer employed by a U.S. defense contractor at a joint military base in Australia. Petitioner husband was so employed during 2015–2017.  Like similarly situated employees, he was asked to sign (and he and his wife allegedly did sign) a Closing Agreement with the Internal Revenue Service (IRS or respondent) waiving the right to claim, with respect to wages earned at the base, the "foreign earned income exclusion" (FEIE) provided by section 911.[1]  In exchange Australia agreed that no Australian income tax would be withheld from his wages.

After enjoying freedom from Australian tax, petitioners seek shelter from U.S. tax as well.  They contend that the Closing Agreement was

---

[1] Unless otherwise indicated, statutory references are to the Internal Revenue Code, Title 26 U.S.C. (Code), in effect at all relevant times, and Rule references are to the Tax Court Rules of Practice and Procedure.

[*2] invalid on various grounds, that their waiver was inoperative, and that they are entitled to claim the FEIE after all. Several Tax Court cases presenting this issue have been resolved on summary judgment, and one case is currently on appeal. *See Smith v. Commissioner*, 159 T.C. 33 (2022), *appeal docketed*, No. 23-1050 (D.C. Cir. Feb. 23, 2023). But this case presents a distinct factual question—whether petitioners actually signed the Closing Agreement. We bifurcated the case and held a partial trial directed solely to that question. Rejecting petitioners' assertions that their signatures were forged, we resolve this question in respondent's favor.

FINDINGS OF FACT

The following facts are derived from the pleadings, two Stipulations of Facts, and documents and testimony admitted into evidence at trial. The notice of deficiency was addressed to petitioners at an address in Colorado, and the parties have stipulated that petitioners resided in Colorado when they timely petitioned this Court. Absent stipulation to the contrary, appeal of this case would apparently lie to the U.S. Court of Appeals for the Tenth Circuit. *See* § 7482(b)(1)(A), (2).

Petitioner husband (Mr. Diaz or petitioner) joined the military at age 18 and served in the U.S. Air Force at various locations in Asia. His final posting was to the Joint Defense Facility Pine Gap (JDFPG or Pine Gap), a joint U.S./Australia military base near Alice Springs in central Australia. While serving at Pine Gap he became acquainted with Raytheon Co., a U.S. defense contractor that employed many people at the base.

After 12 years of military service, Mr. Diaz decided not to reenlist. Instead he applied to work for Raytheon at Pine Gap in a civilian capacity. He returned to the United States in 2014, updated his security clearances, took various tests, and was offered a job by Raytheon in early 2015.

In late July 2015 Mr. Diaz went to Garland, Texas, to complete a three-day on-boarding process for this position. He there executed various documents, including a "Memorandum of Understanding and Agreement" (MOU). By executing the MOU he acknowledged that he had been provided a copy of (and had familiarized himself with) the "International JDFPG Handbook" (Handbook).

The Handbook outlined the conditions of employment with Raytheon at Pine Gap, including the company's requirements relating to

[*3] execution of an IRS closing agreement. "The purpose of the Closing Agreement," the Handbook explained, "is an acknowledgment by the employee that the employee . . . will continue to pay U.S. federal income tax for the period of his [employment] and will not claim any [FEIE] exclusion . . . with respect to income derived from services for Raytheon at JDFPG." "If the employee elects not to sign a Closing Agreement," the Handbook advised, "the Raytheon Payroll Center will be directed to withhold income tax at the Australian rate and forward those withholdings to the Australian Taxation Office."

On July 27, 2015, as part of the on-boarding process, Linda Ross, an administrative officer with Raytheon, explained the closing agreement procedure to Mr. Diaz. Petitioners admitted in their Petition that, "[d]uring th[is] conversation, Petitioner was told that signing the Closing Agreement was a condition of employment for the position that Petitioner took at JDFPG." With that understanding, Mr. Diaz accepted Raytheon's offer of employment. Raytheon made travel arrangements to Australia for petitioner and his family.

Petitioner's employment at Pine Gap commenced on August 7, 2015. When he arrived at the base, Daniel Christensen, who testified credibly at trial, was the Program Administrator for Raytheon at Pine Gap. Mr. Christensen had worked for Raytheon since 2012. He was responsible for employee benefit programs (including housing and transportation), passport renewals, and various documentation requirements, including the execution of IRS closing agreements.

Mr. Diaz met with Mr. Christensen at the base on August 13, 2015, to execute several of these documents. The first was an "Employee Purchase Agreement," relating to a $10,000 interest-free loan extended by Raytheon to facilitate petitioners' purchase of a vehicle. Mr. Diaz signed the document, dating his signature August 13, 2015. Mr. Christensen's signature appears immediately below with the same date. Mr. Christensen signed as the officer providing "Raytheon Final Approval."

The second document, related to the first, was a "Payroll Deduction Authorization." This document authorized Raytheon to deduct from Mr. Diaz's wages the required payments on the vehicle loan. Mr. Diaz signed the document, dating his signature August 13, 2015. Mr. Christensen's signature appears immediately below, with the same date. Mr. Christensen signed as the "Witness" to Mr. Diaz's signature.

[*4]   The third document was the IRS Closing Agreement, four copies of which were required to be signed by petitioners as joint filers. Mrs. Diaz apparently signed the copies first, and Mr. Diaz brought them with him to his meeting with Mr. Christensen. The record is unclear as to whether Mr. Diaz signed the agreement before or during his meeting with Mr. Christensen. In any event, he dated his signature August 13, 2015.

The fourth document was captioned "Declaration." This was a Raytheon document intended to accompany the executed Closing Agreement. All U.S. citizens employed by Raytheon at Pine Gap were required to sign this Declaration. By signing it Mr. Diaz acknowledged that "entering into a closing agreement [wa]s a voluntary action on [his] part" and that, if he had declined to execute the Closing Agreement, Raytheon would "deduct Australian tax installments from [his] salary."

At the bottom of the Declaration appeared a "Note to Employee." It stated as follows: "This form and an executed U.S. closing agreement should be lodged with your employer in duplicate." Immediately below that was a "Note to Employer." It stated as follows: "When this form together with an executed Closing Agreement is submitted to you, they may be considered as authority for not making Australian tax installment deductions."

Mr. Diaz signed the Declaration, dating his signature August 13, 2015. Mr. Christensen affixed his signature immediately below Mr. Diaz's signature. He thereby confirmed that Mr. Diaz's signature had been "witnessed by" him on behalf of Raytheon. Mr. Christensen credibly testified that he could not recall any Raytheon employee at Pine Gap who had ever refused to sign an IRS closing agreement.

The record includes two copies of the Declaration that Mr. Diaz signed on August 13, 2015. Raytheon's file copy appears in the record as part of Exhibit 19-R. Mr. Diaz's copy appears in the record as Exhibit 16-J. The parties have stipulated that Exhibit 16-J "is a declaration for Petitioner Robert Y. Diaz that petitioner Robert Y. Diaz received while working at JDFPG."

Mr. Christensen was in charge of securing executed closing agreements from all U.S. citizens working for Raytheon at Pine Gap. The procedure was as follows: Each employee (and spouse where necessary) would execute four original copies of the closing agreement, and Mr. Christensen would forward them to the IRS for execution. After the

[*5] agreements were signed by an appropriate Treasury official, the IRS would keep one copy of the agreement in its files and send three copies back to Mr. Christensen. Mr. Christensen would keep one copy for Raytheon's files, give one copy to the employee, and send one copy to the Australian Taxation Office.

On February 12, 2016, Mr. Christensen mailed a letter to the IRS forwarding copies of closing agreements executed by 19 Raytheon employees, including Mr. Diaz. Mr. Christensen asked the IRS to "sign all four copies [of each agreement] and return three copies back" to Raytheon in Australia. The letter stated that "the [D]eclarations have also been completed and will be held here for forwarding to the Australian Taxation Office once the Closing Agreements are returned from the IRS."

Mr. Christensen left Raytheon in late February 2016 and George Brown assumed many of his responsibilities. On June 21, 2016, the IRS returned to Raytheon three executed copies of petitioners' Closing Agreement. Mr. Brown received these documents and distributed them as discussed above—one copy to Raytheon's files, one copy to Mr. Diaz, and one copy to the Australian Taxation Office. Raytheon did not withhold any Australian income tax from Mr. Diaz's wages during 2015–2017, and he did not otherwise pay any Australian tax during his employment with Raytheon.

The record includes three copies of the Closing Agreement executed by petitioners, excluding only the copy sent to the Australian Taxation Office. The IRS file copy, bearing the signatures of both petitioners dated August 13, 2015, appears in the record as Exhibit 14-R. Raytheon's file copy, bearing the signatures of both petitioners dated August 13, 2015, appears in the record as part of Exhibit 19-R. Petitioners' copy of the Closing Agreement, bearing their signatures dated August 13, 2015, appears in the record as Exhibit 17-J. The parties have stipulated that Exhibit 17-J "is a copy of the Closing Agreement for petitioner Robert Y. Diaz that petitioner Robert Y. Diaz received while working at JDFPG."

During 2015 Mr. Diaz was paid $43,462 for the services he performed for Raytheon at Pine Gap. For the 2015 taxable year petitioners timely filed Form 1040, U.S. Individual Income Tax Return, reporting that income. Consistently with their obligations under the Closing Agreement, they did not claim the FEIE with respect to any portion of the wages Mr. Diaz earned at Pine Gap.

[*6]    During 2016 Mr. Diaz was paid $113,576 for the services he performed for Raytheon at Pine Gap.  For the 2016 taxable year petitioners timely filed Form 1040 reporting that income.  Consistently with their obligations under the Closing Agreement, they did not claim the FEIE with respect to any portion of the wages Mr. Diaz earned at Pine Gap.

On March 1, 2018, petitioners filed with the IRS Form 1040X, Amended U.S. Individual Income Tax Return, for 2016.  On that return they claimed the FEIE with respect to the bulk of the wages Mr. Diaz earned at Pine Gap.  They accordingly requested a refund of $9,434.  Respondent admitted in his Answer that "the IRS issued [a] refund[] based on the information petitioners reported on the Form 1040X for 2016."

During 2017 Mr. Diaz was paid $75,563 for the services he performed for Raytheon at Pine Gap (his employment there having terminated on August 6, 2017).  For the 2017 taxable year petitioners timely filed Form 1040 reporting that income.  On that return they claimed the FEIE with respect to the bulk of the wages Mr. Diaz earned at Pine Gap.

The IRS selected petitioners' 2016 and 2017 returns for examination.  It determined (among other things) that they were ineligible for the FEIE because they had waived the right to claim that exclusion by executing the Closing Agreement.  On May 12, 2020, the IRS mailed petitioners a timely notice of deficiency determining deficiencies of $9,434 and $10,836 for 2016 and 2017, respectively, plus accuracy-related penalties under section 6662(a).

Petitioners timely petitioned this Court.  They alleged in their Petition that "the signatures on [the] Closing Agreement that the IRS has in [its] possession do not contain signatures of Petitioners."  They further alleged that Mr. Diaz "did not sign nor was he provided a copy of the Closing Agreement for [his wife] to sign."

On May 24, 2023, petitioners' counsel moved to withdraw, indicating that she had represented them "pursuant to a third-party payor agreement that is no longer in existence."  We granted that Motion and petitioners thereafter proceeded pro sese.  On September 13, 2023, respondent filed a Motion to Bifurcate, requesting that we "bifurcate the trial proceedings . . . and proceed first with the issue of whether petitioners signed the Closing Agreement."

In his Motion to Bifurcate respondent indicated that he had "sent an original of the [C]losing [A]greement to the IRS Criminal Investigation's Center for Science and Design for handwriting analysis."  That

**[\*7]** office was asked to compare Mr. Diaz's signatures, as they appeared on the Closing Agreement and the Declaration, with his signatures as they appeared on 11 other documents produced from the personnel file that Raytheon had maintained for Mr. Diaz. The resulting report found "indications" that Mr. Diaz "may have written the questioned signature" on the Closing Agreement, but it found these indications "far from conclusive." The report reached "no conclusion" as to whether Mr. Diaz had written the questioned signature on the Declaration.[2]

In the light of this report, respondent represented that there "remain[ed] a genuine dispute of material fact as to whether or not petitioners signed the [C]losing [A]greement." We granted the Motion to Bifurcate and set this case for a partial trial limited to the question of the authenticity of their signatures. We held the partial trial via Zoomgov on December 14, 2023, with petitioners appearing from Australia.

OPINION

I.    *Burden of Proof*

Section 7121(a) authorizes the Secretary to "enter into an agreement in writing with any person relating to the liability of such person . . . in respect of any internal revenue tax for any taxable period." The Code refers to these agreements as "closing agreements." Under section 7121(b), once a closing agreement is approved by the Secretary or her delegate, the agreement is "final and conclusive . . . except upon a showing of fraud or malfeasance, or misrepresentation of a material fact."

Petitioners contend that the Closing Agreement is invalid because the signatures appearing above their names are not their signatures but were forged. As with factual matters generally, petitioners bear the burden of proving the facts they allege. *See* Rule 142(a); *Welch v. Helvering*, 290 U.S. 111, 115 (1933). In certain circumstances section 7491 may shift to the Commissioner the burden of proof with respect to a factual issue relevant in ascertaining the taxpayer's liability. But that section applies only if the taxpayer (among other things) "introduces credible evidence with respect to [that] factual issue." § 7491(a)(1). Petitioners have adduced no credible evidence substantiating their

---

[2] The report explained that "[a]ll of the questioned and known signatures [of Mr. Diaz] contain stylization, where features of individual characters are not discernible. This style of writing limits the features available for comparison."

[*8] allegations that their signatures on the Closing Agreement and/or Declaration were forged. The burden of proof thus remains on them.

## II. *Signature Authenticity Issue*

We find as a fact that the signatures of Mr. Diaz and his wife that appear on the Closing Agreement are in fact their signatures. We have set forth above our findings of fact concerning the timeline of events before and after August 13, 2015, the date on which Mr. Diaz signed the agreement and the accompanying Declaration. Mr. Diaz testified as to a very different version of the timeline at trial, and he relied heavily on what might be called the "forensic evidence" presented by different versions of his signatures on various Raytheon documents. We discuss his contentions in turn below.

### A. *Timeline of Events*

At trial Mr. Diaz admitted having been told during the on-boarding process that he would need to sign an IRS closing agreement. But he assertedly refused, stating: "Looks like I'll be looking for another job." The reason he allegedly refused to sign a closing agreement was that he did not want to waive the FEIE, which he supposedly regarded as a valuable tax benefit. He accepted the Raytheon job and went to Australia, allegedly believing that he could extricate himself from the closing agreement requirement. After arriving at Pine Gap he said he was confronted on multiple occasions by Mr. Christensen, who told him that he needed to sign a closing agreement. Each time he allegedly refused, stating: "Looks like I'll be looking for another job." He testified that in late 2016 he was confronted by Mr. Brown—Mr. Christensen's replacement—who again insisted that he sign a closing agreement. Allegedly he again refused.

We did not find Mr. Diaz to be a credible witness, and we found his version of the story to be wholly implausible. That is so for numerous reasons:

● Mr. Diaz admitted in the Petition that Ms. Ross told him, during the July 2015 on-boarding process, that "signing the Closing Agreement was a condition of employment for the position that [he] took at JDFPG." Mr. Diaz cannot plausibly have believed that he could somehow get out of this condition of employment. He had previously served for 12 years at overseas U.S. military bases, where rules tend to be strictly enforced.

**[*9]** ● During 2014 and 2015 Mr. Diaz spent months preparing for the Raytheon job and went to Texas for the final on-boarding process. After incurring these costs, flying halfway around the world, securing housing from Raytheon in Alice Springs for his family, purchasing a vehicle with a loan from Raytheon, and working in Australia for many months, it is implausible that he would have told Messrs. Christensen and Brown that he would "be looking for another job" rather than execute a closing agreement. We find it incredible that petitioner would incur these sunk costs, quit a well-paying job, and uproot himself and his family from Australia for no logical reason.

● Mr. Diaz's alleged reason for refusing to sign a closing agreement—that he did not want to forfeit the benefit of claiming the FEIE—makes no economic sense. He was repeatedly informed that, in exchange for waiving the FEIE, his wages would be exempt from Australian income tax. In the Declaration he acknowledged that Raytheon would withhold Australian tax if he had declined to sign a closing agreement. But as Raytheon explained in the Handbook he reviewed, "Australian tax rates are higher than current U.S. tax rates." Petitioners have offered no rational explanation as to why they would have preferred, against their economic interest, to pay Australian tax instead of U.S. tax.

● Mr. Christensen affixed his signature on the Declaration immediately below Mr. Diaz's signature. He thereby confirmed that Mr. Diaz's signature on the Declaration had been "witnessed by" him on behalf of Raytheon. By signing the Declaration, Mr. Diaz acknowledged that "entering into a closing agreement is a voluntary action on my part." The Closing Agreement and the Declaration were signed the same day, August 13, 2015. It is wholly implausible that Mr. Diaz would have signed the Declaration—as Mr. Christensen confirmed that he did—while refusing to sign the Closing Agreement to which the Declaration refers.

● Mr. Diaz's assertion that Mr. Brown confronted him in late 2016 about the need to sign a closing agreement is not credible. Mr. Christensen had forwarded four original copies of the Closing Agreement, signed by both petitioners, to the IRS in February 2016. In June 2016 the IRS returned three fully executed copies of the Closing Agreement to Raytheon. Mr. Brown would thus have had no occasion, in late 2016, to confront Mr. Diaz about his failure to sign the Closing Agreement.

[*10]  ● Raytheon distributed original copies of the Closing Agreement to Mr. Diaz and the Australian Taxation Office, retaining one copy in its files.  The parties have stipulated that Exhibit 17-J "is a copy of the Closing Agreement for petitioner Robert Y. Diaz that petitioner Robert Y. Diaz received while working at JDFPG."  Mr. Diaz's admission that he received a fully executed copy of the Closing Agreement while working at Pine Gap sits uneasily with his assertion that he repeatedly refused to sign the Closing Agreement while working at Pine Gap.

● The parties have stipulated that Exhibit 16-J "is a Declaration for Robert Y. Diaz that petitioner Robert Y. Diaz received while working at JDFPG."  This is the Declaration that Mr. Diaz signed on August 13, 2015, during his meeting with Mr. Christensen.  Mr. Diaz's admission that he received an executed copy of the Declaration while working at Pine Gap sits uneasily with his assertion that his signature on the Declaration was forged.

● Petitioners have offered no plausible explanation as to who "forged" their signatures on the Closing Agreement, or why anyone at Raytheon would have done this.  Mr. Christensen, who witnessed Mr. Diaz's signature on the Declaration, was the Raytheon employee responsible through February 2016 for the entire closing agreement process.  He testified—firmly and credibly—that he would never have forged a signature on any document, much less a document that he was tasked with submitting to the IRS.  If petitioners had really declined to sign the Agreement, Raytheon's obvious response—as stated in the Declaration and Handbook—would have been to withhold Australian tax from Mr. Diaz's wages.  The notion that a Raytheon employee would instead forge petitioners' signatures on a closing agreement is wholly implausible; that person would have everything to lose, and nothing to gain, by doing this.  Petitioners offer nothing but conspiracy theories in support of a contrary conclusion.

● Finally, the proof of the pudding is in the eating.  Mr. Diaz received wages from his employment at Pine Gap during 2015, but petitioners did not claim the FEIE on their 2015 tax return.  Mr. Diaz received wages from his employment at Pine Gap during 2016, but petitioners did not claim the FEIE on the return they originally filed for 2016. Mr. Diaz asserted that he regarded the FEIE as such a valuable tax benefit that he would rather quit his job than forfeit that benefit.  If that were true, petitioners' failure to claim the FEIE on two consecutive tax returns is inexplicable.

**[\*11]**  B.  *"Forensic Evidence"*

In response to a trial subpoena Raytheon produced more than a dozen documents from Mr. Diaz's personnel file.  These documents included copies of the signature page of his U.S. passport (and that of his wife); forms verifying the identities of his wife and dependent children; requests for cash travel benefits; authorizations for payroll deductions; agreements regarding his conditions of employment; employee time card forms; an acknowledgment of changes in benefits; a residential tenancy agreement; and his notice of resignation from Raytheon effective August 6, 2017.

The documents produced from Mr. Diaz's personnel file include Raytheon's copy of the executed Closing Agreement and a copy of the related Declaration signed by Mr. Diaz and witnessed by Mr. Christensen on August 13, 2015.  Petitioners insist that their signatures on those two documents were forged.  They admit that their signatures on all other documents produced from Mr. Diaz's personnel file are genuine.

Neither party called a handwriting expert as a witness, and this Court professes no expertise on the subject.  But superficial observation reveals a number of commonalities among Mr. Diaz's writings on the Closing Agreement, the Declaration, and the other personnel documents that bear his signature:

● On many of the documents Mr. Diaz printed his name at the top and placed his signature below.  The printed version of his name is quite idiosyncratic.  "Robert" is printed in the usual way, with a capital "R" and all other letters lower case. "Young," his middle name, is printed with a capital "Y," three lower-case letters, and a capital "G."  And Diaz is printed with a capital "D," a lower-case "i," and a capital "A" and "Z." Every personnel document shows his printed name in this manner.  And so do the Closing Agreement and the Declaration, in exactly the same way.  We find this very persuasive evidence that Mr. Diaz completed all of these documents.

● The personnel file includes four documents ostensibly signed by Mr. Diaz on August 13, 2015—the Closing Agreement, the Declaration, the Employee Purchase Agreement, and the Payroll Deduction Authorization.  In each case, Mr. Diaz dated the document as "13 AuG 2015" or "13 AuGust 2015."  He thus wrote "AuGust" using a capital "G," just as he did when writing "YounG."  We find this persuasive evidence that Mr. Diaz completed all four documents.

**[\*12]** ● Mr. Diaz's signatures on the documents contained in his personnel file do vary somewhat. His first name is generally written as something like "Rob," Rbt," or "R." His middle name generally appears as "Y," sometimes followed by a squiggle. And his last name is generally written as "Di," sometimes followed by a squiggle. Despite these variations, his signatures on the Declaration and the Closing Agreement resemble his signatures on the other personnel documents in terms of how the letters are formed, the angle at which the letters are written, and the spacing between the names. And his wife's signature on the Closing Agreement closely resembles her signature on her passport and on another document from the personnel file that bears her signature.

● Petitioners' chief argument is that Mr. Diaz's signature on the Closing Agreement, unlike his other signatures, spells out at least part of his middle name. To the extent the signatures differ, it is a difference of degree rather than of kind. As noted above, Mr. Diaz often wrote his middle name as "Y" with a squiggle. On the Closing Agreement, the squiggle is perhaps a millimeter longer than on other iterations of his signature.

On balance, we find that the "forensic evidence" regarding petitioners' signatures points to the same conclusion as the timeline of events discussed earlier. Petitioners have failed to carry their burden of proving that their signatures on the Closing Agreement were forged. We thus find as a fact that the signatures of Mr. Diaz and his wife that appear on the Closing Agreement are their genuine signatures.[3]

---

[3] A 19-page post-trial brief was submitted on petitioners' behalf. It is devoted largely to technical questions about tax treaties, Australian law, and other matters irrelevant to the signature authenticity issue. Petitioners admitted at trial that they were "working with" a lawyer named John Castro. Mr. Castro did not enter an appearance in this case; he is not admitted to practice in this Court (or apparently in any other court); and he was recently indicted for tax crimes. *See* Press Release, U.S. Dep't of Justice, Mansfield Man Charged in Fraudulent Tax Return Scam (Jan. 10, 2024), https://www.justice.gov/usao-ndtx/pr/mansfield-man-charged-fraudulent-tax-return-scam. The Court believes that petitioners' post-trial brief was likely ghost-written by Mr. Castro or someone associated with him. That brief devotes less than a page to discussion of the signature authenticity issue. On that page it asserts that "the Closing Agreement contained a witness signature section" and finds it suspicious that Mr. Christensen did not sign the Closing Agreement as a witness to petitioners' signatures. But the Closing Agreement does not have "a witness signature section"; the Closing Agreement has signature lines only for the taxpayers, their representative (if any), and the Commissioner of Internal Revenue. Witness signature sections were contained in the other three documents Mr. Diaz signed on August 13, 2015—the Declaration, the

**[\*13]**  To reflect the foregoing,

*Decision will be entered upon the conclusion of further proceedings in this case.*

---

Employee Purchase Agreement, and the Payroll Deduction Authorization.  Mr. Christensen duly signed each of those documents as a witness and/or approving officer for Raytheon.